# UNITED STATES DISTRICT COURT

**FILED**

for the

Eastern District of California

MAY 3 0 2017

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) Case No. |
| | ) |
| IBIS ALBERTO LUIS-FLORES AND | ) **2: 17 - MJ - . 8 8 KJN** |
| STEVEN CHRISTOPHER SACHAROW | ) |
| | ) |
| _____ | |
| *Defendant(s)* | |

SEALED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  January 1, 2016 through May 30, 2017  in the county of  Sacramento  in the

Eastern  District of  California  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 846 and 841(a)(1) | Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine |
| 21 U.S.C. § 841(a)(1) | Distribution and Possession with Intent to Distribute Heroin and Methamphetamsine |

This criminal complaint is based on these facts:

(see attachment)

☒  Continued on the attached sheet.

_____
*Complainant's signature*

Maxim Lashchuk, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  May 30, 2017

_____
*Judge's signature*

City and state:  Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Maxim Lashchuk, Special Agent with the Drug Enforcement Administration (DEA), being first duly sworn, hereby declare and state as follows:

### Background and Expertise

1. I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18 of the United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18 and Title 21 of the United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C).

2. I am a Special Agent with the United States Drug Enforcement Administration (DEA) and have been so employed since 2014. Upon being hired by the DEA, I completed approximately eighteen weeks of DEA Basic Agent training at the DEA Training Academy in Quantico, Virginia where I received specialized training in the Controlled Substance Act, Title 21, of the United States Code, including, but not limited to, Sections 841(a)(1) and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively. During Basic Agent training I received in excess of 500 hours of specialized training in narcotic investigation matters to include but not limited to training in search and seizure law, interviews and interrogations, drug identification, drug trafficking trends and methods, evidence gathering, report writing, money laundering, asset forfeiture, undercover operations, physical and electronic surveillance operations, and confidential source management. After completing Basic Agent training, I was assigned to my current assignment at the DEA San Francisco Field Division, Sacramento District Office, Task Force Group.

3. During the course of my employment with the DEA, I have participated in and/or led investigations targeting individuals involved in trafficking of heroin, methamphetamine, cocaine, crack cocaine, LSD, marijuana, steroids, and pharmaceutical drugs. While conducting these types of investigations, I have written reports of investigation and affidavits, interviewed defendants and confidential informants regarding narcotics trafficking, conducted physical and electronic surveillance, arrested violators and co-conspirators, testified in grand jury proceedings, obtained and analyzed telephone toll data, open source public records, financial records, notes, and drug ledgers.

4. I have participated in the execution of dozens of search warrants to search particular places or premises for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes. I have personally been the affiant for warrants which resulted in the seizures of controlled substances, firearms, drug proceeds, assets, and resulted in arrests and convictions. Through my training, experience, and interaction with other experienced Special Agents, I have encountered and become familiar with various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and drug trafficking organizations in their efforts to import, store, conceal, transport, manufacture, and distribute controlled substances. Central to all trafficking efforts, regardless of the drug, is the

traffickers' effort to make a profit from those dealings or transactions, either for the purchase of additional substances or material gain.

5.  Unless stated otherwise, I have personal knowledge of the matters set forth in this affidavit. To the extent that any information in this affidavit is not within my personal knowledge, it was made known to me through my own review of the documents discussed in this affidavit and through reliable law enforcement sources, including discussions with other law enforcement officers and intelligence analysts assigned to this case.  The conclusions and opinions set forth below are based on my experience and training as a DEA Special Agent, and conversations I had with other law enforcement officers who are familiar with the facts and circumstances of this investigation.  Because this Affidavit is being submitted for the limited purpose of securing Search and Arrest Warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary and appropriate to establish probable cause for the Search and Arrest Warrants requested herein.

### Scope of Requested Search Warrant

6.  This Affidavit is being submitted in support of a search warrant to search the following:

    A.  The residence located at **1570 Baines Ave., Sacramento, California.**
    B.  The garage located at **1601 Juliesse Ave. Unit F, Sacramento, California.**
    C.  The northernmost garage located at **1601 Juliesse Ave., Sacramento, California,** with the following logo on the pedestrian door: **"Applied Liberty Solutions, 844-4-APPLIED."**
    D.  The residence located at **4134 Vicksburg Lane, North Highlands, California.**
    E.  The person of **Richard Garnica TORRES.**

7.  Based on the facts set forth below, I believe that **Ibis Alberto LUIS-FLORES** is a poly-drug trafficker who is currently involved in the distribution of heroin and methamphetamine. I believe that LUIS-FLORES is storing and distributing heroin and methamphetamine from the garage located at **1601 Juliesse Ave., Unit F, Sacramento, California** and the garage adjacent and just north of Unit F, which I believe are both used as a drug stash location. Further, I believe that LUIS-FLORES is keeping heroin, methamphetamine, drug proceeds, and other items of evidence at his current residence located at **1570 Baines Ave., Sacramento, California**.  I believe that LUIS-FLORES is currently utilizing cellular telephone (415) 987-6985 to facilitate his drug trafficking activities.

8.  I believe that **Steven Christopher SACHAROW** is a sub-distributor of heroin and methamphetamine for LUIS-FLORES and is storing and distributing heroin and methamphetamine at his current residence located at **4134 Vicksburg Lane, North Highlands, California**.

9.  I further believe that **Richard Garnica TORRES** is a drug runner for LUIS-FLORES who transports and distributes heroin and methamphetamine. TORRES currently has an

2

outstanding misdemeanor warrant due to his failure to appear in court regarding his 2014 arrest for felony Possession of Methamphetamine.

10. This Affidavit therefore requests authority to search the locations and persons described in Attachment A in order to locate and seize the items described in Attachment B as evidence and instrumentalities of the following crimes:

  - Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine.

  - Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute Heroin and Methamphetamine.

## Background of Investigation

*ML. 5-30-17*

11. Beginning in mid-2015, I began an investigation of a heroin and methamphetamine drug trafficking organization (DTO) headed by Ibis Alberto ~~LUIS~~-LUIS-FLORES who I suspected of distributing heroin and methamphetamine for the Sinaloa Cartel throughout northern California and beyond. In July of 2015, I learned about LUIS-FLORES' DTO after arresting LUIS-FLORES' suspected sub-distributor and criminal associate, Omar Erubiel VALENZUELA-VALENZUELA, and seizing approximately a pound of heroin and a pound of methamphetamine, a loaded hand gun, approximately $64,000 in drug proceeds, and cellphones from VALENZUELA's residence.

12. Subsequent toll analysis of VALENZUELA's seized cellphone indeed showed that VALENZUELA contacted a Mexican phone number identified by the DEA as a number used by a Sinaloa Cartel drug trafficker in Mexico. Tolls showed that VALENZUELA was also in regular telephone contact with a 916-578-9845 phone number, subsequently identified to be used by LUIS-FLORES, and the 916-578-9845 phone number was the only other 916 area code number that was in contact with the same Mexican SOS number, but at a much higher frequency than VALENZUELA. This observation led me to believe that LUIS-FLORES was the individual who regularly supplied VALENZUELA with the heroin and methamphetamine on behalf of the Mexican SOS with whom they mutually communicated. Tolls showed that after VALENZUELA was arrested, LUIS-FLORES stopped using the 916-578-9845 phone number. I believe LUIS-FLORES had done so to avoid detection by law enforcement after he learned about VALENZUELA's arrest.

13. In an attempt to identify LUIS-FLORES' new phone number, DEA Intelligence Research Specialist (IRS) Matthew Kregor performed a common call analysis of LUIS-FLORES' top contacts in the 916-578-9845 tolls and determined that immediately after VALENZUELA's arrest many of LUIS-FLORES' top contacts began communicating with a new 970-689-6113 phone number, which was activated only several hours after VALENZUELA was arrested. Immediately upon activation, 970-689-6113 placed several consecutive phone calls to the same Mexican SOS number that VALENZUELA and LUIS-FLORES were mutually in contact with. This led me to believe that the individual (LUIS-FLORES) who used 916-578-9845 was now using the 970-689-6113 number. On September 18, 2015, I obtained a federal

3

ping order (2:15-SW-0509 CKD), authorized by Honorable U.S. Magistrate Judge Carolyn K. Delaney, for the 970-689-6113 phone number. Pings showed that 970-689-6113 spent the nighttime hours at an address in Sacramento, California, which had the utilities listed under the name of Maria VALDOVINOS who is LUIS-FLORES' wife. I then verified through surveillance that LUIS-FLORES was in the area where 970-689-6113 pinged to, which led me to believe that LUIS-FLORES was using and carrying the 970-689-6113 cellphone.

14. After making inquiries with state and federal databases, I was unable to locate any documented criminal history for LUIS-FLORES. However, I learned that LUIS-FLORES was an illegal alien and used multiple aliases, fraudulent Social Security numbers, provided false telephone subscriber information, and drove vehicles either with paper plates or vehicles registered to other individuals, all in an effort which I believe was to conceal his true identity and avoid detection by law enforcement.

15. Since the beginning of this investigation, IRS Kregor identified more than a dozen cellphone numbers that were used by LUIS-FLORES. I obtained court authorized GPS location data (pings), as described below, for many of LUIS-FLORES' phone numbers and verified through surveillance that LUIS-FLORES was carrying and using those phones. Phone toll analysis of LUIS-FLORES' phones revealed that LUIS-FLORES was in regular contact with many known and convicted drug traffickers in Northern California and throughout the United States, to include those who were recently arrested for possession and sales of heroin and methamphetamine. After VALENZUELA's arrest, LUIS-FLORES continued to stay in telephone contact with several identified Sinaloa Cartel members suspected of importing large quantities of heroin and methamphetamine into the United States from Mexico. Also, LUIS-FLORES continued to regularly change his phone numbers approximately every 1-2 months, which based on my training and experience is common among drug traffickers in an effort to avoid detection and interception by law enforcement.

### Suspicious Travels of LUIS-FLORES and his Drug Runners

16. On November 2, 2015, I obtained a federal ping order (2:15-SW-0597 EFB), authorized by Honorable U.S. Magistrate Judge Edmund F. Brennan, for LUIS-FLORES' 970-689-6113 phone number. On November 28, 2015, pings showed that 970-689-6113 traveled by a vehicle to the Mexican border near San Ysidro, California. I observed that immediately before leaving Sacramento, 970-689-6113 pinged to a local gas station. I obtained the surveillance video from that gas station and observed that LUIS-FLORES' drug runner, **Richard Garnica TORRES**, had fueled up the vehicle before departing, and a dark skinned male adult, tentatively matching the description of LUIS-FLORES was in the passenger side of the vehicle. Within hours of arriving to the Mexican border, pings showed that 970-689-6113 returned to Sacramento, California by a train, subsequently arriving to the address of 1309 Main Ave., Sacramento, California. This address contained a large outdoor marijuana grow and a camper, which I suspected was used by the LUIS-FLORES DTO as a drug storage location. I believe that this short trip to the Mexican border by LUIS-FLORES and his drug runner **TORRES** was drug related and that they obtained narcotics from their SOS and transported the narcotics to Sacramento for distribution.

17. I made inquiries with the National Crime Information Center (NCIC) and learned that in 2013 **TORRES** was arrested for Alien Smuggling (Driver). Also in 2014, **TORRES** was arrested for felony Possession of Methamphetamine, which is still pending adjudication. Subsequently I learned that on August 17, 2016, a misdemeanor warrant (03250962) was issued for the arrest of **TORRES** due to his failure to appear in court for the 2014 drug charge. While out on this outstanding warrant, **TORRES** continued to distribute heroin as described below in this affidavit.

18. I also inquired with the U.S. Customs and Border Protection regarding any border crossing records of **TORRES** and learned that on November 29, 2015 (when pings showed that 970-689-6113 traveled to the U.S./Mexican border), **TORRES** crossed into the U.S. through the San Ysidro, California Point of Entry.

19. On December 10, 2015, I obtained a federal ping order (2:15-SW-0638 CKD), authorized by Honorable U.S. Magistrate Judge Carolyn K. Delaney, for LUIS-FLORES' new cellphone number, 628-300-8054, which IRS Kregor identified based on common call analysis of LUIS-FLORES' top contacts, the similar contacts 628-300-8054 had as LUIS-FLORES' previous numbers and the corresponding of the dates when the old number was dropped and the new number was activated. Pings placed 628-300-8054 in the general area of LUIS-FLORES' current residence of **1570 Baines Ave.**, Sacramento, California. IRS Kregor subsequently learned that LUIS-FLORES had utilities listed in his alias name of "Luis FLORES" at the **1570 Baines Ave.** address since September 25, 2015. Also, a SMUD utilities information request for LUIS-FLORES' wife, Maria VALDOVIDOS, showed that service was activated in her name **at 1570 Baines Ave.** since July 22, 2015. I conducted surveillance and regularly observed LUIS-FLORES, his wife, his associates, and LUIS-FLORES' vehicles at the **1570 Baines Ave.** address.

20. On December 23, 2015, 628-300-8054 pinged at 1309 Main Ave., Sacramento, California, which I suspected was used as a drug stash location at that time by LUIS-FLORES and his associates. I conducted surveillance at this address and subsequently observed LUIS-FLORES depart this address on a vehicle. Pings continued to move in the direction where LUIS-FLORES was traveling, confirming that LUIS-FLORES was using cellphone number 628-300-8054 as I had suspected. At the 1309 Main Ave. address I observed other individuals and vehicles registered to individuals who had drug trafficking histories and gang affiliations. Through surveillance I observed that LUIS-FLORES, **TORRES**, and their associates continued to use 1309 Main Ave., until approximately late March of 2016 and then they moved out.

21. After LUIS-FLORES dropped the 628-300-8054 number, IRS Kregor identified a new 415-308-1545 phone number suspected to be used by LUIS-FLORES, based on common call analysis of LUIS-FLORES' top contacts, the similar contacts 415-308-1545 had as LUIS-FLORES' previous numbers and the corresponding of the dates when the old number was dropped and the new number was activated. Cellular tower data showed that on the night of March 4th, 2016, LUIS-FLORES travelled to the Los Angeles, California, area and returned to Sacramento on the night of March 5, 2016. Also, cellular tower data showed that on March 14, 2016, LUIS-FLORES travelled to the Los Angeles area and returned to Sacramento on

the night of March 15, 2016. I subsequently subpoenaed Enterprise Holdings LLC regarding
LUIS-FLORES' car rental history and learned that on March 4-7, 2016, and also on March
13-16, 2016, LUIS-FLORES rented vehicles in his name. The rental dates corresponded
with the dates cell tower data showed that LUIS-FLORES travelled to the Los Angeles area.
Enterprise records showed that LUIS-FLORES regularly rented vehicles and the miles put on
matched the distance it takes to travel from Sacramento to the Los Angeles area. I believe
LUIS-FLORES rented vehicles to avoid detection by law enforcement while meeting his
SOS in the Los Angeles area.

22. After LUIS-FLORES dropped the 415-308-1545 number, IRS Kregor identified a new 916-
500-3379 phone number suspected to be used by LUIS-FLORES, based on common call
analysis of LUIS-FLORES' top contacts, the similar contacts 916-500-3379 had as LUIS-
FLORES' previous numbers, and the corresponding of the dates when the old number was
dropped and the new number was activated. Cellular tower data showed that on the night of
April 21, 2016, LUIS-FLORES travelled to the Los Angeles area and returned to Sacramento
on the morning of April 25, 2016. Also, cellular tower data showed that on May 3, 2016,
LUIS-FLORES travelled to the Los Angeles area and returned to Sacramento on the evening
of May 4, 2016.

23. After LUIS-FLORES dropped the 916-500-3379 number, IRS Kregor subsequently
identified a new 916-698-1181 phone number suspected to be used by LUIS-FLORES, based
on common call analysis of LUIS-FLORES' top contacts, the similar contacts 916-698-1181
had as LUIS-FLORES' previous numbers, and the corresponding of the dates when the old
number was dropped and the new number was activated. Cellular tower data showed that on
the morning of June 5, 2016, LUIS-FLORES travelled to the Los Angeles area and returned
to Sacramento on the night of June 6, 2016.

24. After LUIS-FLORES dropped the 916-698-1181 number, IRS Kregor subsequently found
that LUIS-FLORES began using his previously used 415-308-1545 phone number, based on
common call analysis of LUIS-FLORES' top contacts and the similar contacts 415-308-1545
had as LUIS-FLORES' previous numbers. Cellular tower data showed that on the night of
July 15, 2016, LUIS-FLORES travelled to the Los Angeles area and returned to Sacramento
on the morning of July 20, 2016. Also, cellular tower data showed that on August 4, 2016,
LUIS-FLORES travelled to the Los Angeles area and returned to Sacramento on August 5,
2016.

25. During these short and suspicious trips, LUIS-FLORES was in telephone contact with
multiple known and convicted drug traffickers. Due to the fact that LUIS-FLORES made an
effort to regularly change his phone numbers and based on the very short duration of his trips
to the Los Angeles area, I suspected that LUIS-FLORES made these trips to obtain heroin
and methamphetamine from his SOS and transported the narcotics to Sacramento for
distribution.

### Identification of LUIS-FLORES' Sub-distributor Steven SACHAROW

26. Phone toll analysis of LUIS-FLORES' multiple identified phone numbers suggested that
Steven Christopher SACHAROW was a drug sub-distributor for LUIS-FLORES based on

SACHAROW's drug trafficking history and the regular telephone contact SACHAROW had with LUIS-FLORES. I made inquiries with NCIC and learned that SACHAROW had an extensive criminal history for offenses including but not limited to: a conviction in 2000 for Fraud to Obtain Aid; multiple misdemeanor arrests between 2001 and 2007 for Reckless Driving, Unsafe Driving, and Driving While License Suspended; a misdemeanor conviction for Transport of a Controlled Substance (methamphetamine) in 2009; a misdemeanor conviction for Transport of a Controlled Substance (methamphetamine) in 2010; and a felony conviction in 2011 for Transport of a Controlled Substance (methamphetamine) which resulted in a two year prison sentence.

27. In May of 2016, DEA Special Agent Brian Nehring, acting in an undercover capacity, was introduced to SACHAROW. SACHAROW provided a telephone number of 916-869-5828 where he could be reached if SA Nehring wanted to obtain heroin or methamphetamine from SACHAROW.

## July 2016 Undercover Deal with SACHAROW

28. On July 12, 2016, Special Agent Nehring met with SACHAROW and purchased 50.4 grams of heroin. Prior to this meeting, SACHAROW told Special Agent Nehring that he would call his SOS to have the heroin delivered. Phone tolls showed that SACHAROW contacted 415-308-1545, a telephone number identified to be used by LUIS-FLORES during that time period. Shortly later, surveillance observed **TORRES** arrive and meet with LUIS-FLORES at LUIS-FLORES' residence (**1570 Baines Ave.**) and both went inside. Then approximately ninety minutes later **TORRES** drove away in a white Ford Transit van. Approximately forty minutes later, surveillance observed **TORRES** arrive on the same Ford Transit van to SACHAROW's residence, and walk towards the residence. Then approximately two minutes later **TORRES** returned to the van and drove away. At this time, Special Agent Nehring called SACHAROW, who stated that the heroin was just delivered and that he will be meeting Special Agent Nehring shortly. Moments later, SACHAROW left his residence and drove to the meet location where he sold 50.4 grams of heroin to Special Agent Nehring.

29. Meanwhile, surveillance followed **TORRES** away from SACHAROW's residence to a gas station near LUIS-FLORES's residence where **TORRES** briefly met with LUIS-FLORES by the pumps. After this meeting, LUIS-FLORES drove away on a separate vehicle and **TORRES** returned to LUIS-FLORES' residence and walked inside. The chain of events that unfolded during this undercover drug deal, led me to believe that LUIS-FLORES was supplying SACHAROW with the heroin and that **TORRES** was a drug runner working at the direction of LUIS-FLORES. I believe that **TORRES** delivered the heroin to SACHAROW immediately prior to SACHAROW's heroin deal with Special Agent Nehring. Then **TORRES** met with LUIS-FLORES at the gas station to give LUIS-FLORES the cash proceeds generated from the sale of the heroin.

30. It should be noted that during the period of August 2016 through October 2016, Special Agent Nehring conducted three separate drug deals with SACHAROW. Tolls showed that SACHAROW attempted to contact LUIS-FLORES' old known phone numbers but was unsuccessful since LUIS-FLORES had changed his number. Therefore, SACHAROW contacted his alternate sources of supply who supplied SACHAROW with both heroin and

methamphetamine. During the August 2016 undercover deal, Special Agent Nehring purchased 50.5 grams of heroin and 83.2 grams of methamphetamine from SACHAROW. During the September 2016 undercover deal, Special Agent Nehring purchased 52.5 grams of heroin and 114.4 grams of methamphetamine from SACHAROW. During the October 2016 undercover deal, Special Agent Nehring purchased 72.7 grams of heroin from SACHAROW.

## Identification of LUIS-FLORES' New Drug Stash Location

31. On October 20, 2016, I obtained a federal ping order (2:16-SW-627 KJN), authorized by Honorable U.S. Magistrate Judge Kendall J. Newman, for LUIS-FLORES' 530-312-7575 cellphone number. Upon activation, during the night hours, 530-312-7575 pinged to LUIS-FLORES's residence of **1570 Baines Ave.** I conducted surveillance and observed LUIS-FLORES alone in a vehicle where the pings were showing 530-312-7575 to be. This confirmed that LUIS-FLORES was carrying and using cellphone 530-312-7575 as I had suspected.

32. On the night of October 28, 2016, pings showed that LUIS-FLORES traveled by a vehicle down south to San Juan Capistrano, California. Prior to leaving Sacramento, LUIS-FLORES stopped by the two northernmost garages located at **1601 Juliesse Ave.,** Sacramento, California, which is a warehouse style building containing seven separate garages, labeled in an ascending alphabetical order beginning with the letter A. I subsequently drove by these garages and observed that one of the garages which LUIS-FLORES visited was labeled "F" and second one, which was adjacent to and just north of the **unit "F" garage,** didn't have any letter markers but had the following logo: **"Applied Liberty Solutions, 844-4-APPLIED."** These two northernmost garages hereinafter will be referred to as the **"drug stash location."**

33. Pings showed that in San Juan Capistrano, California, LUIS-FLORES went to a park, a movie theater, spent a lot of time in various parking lots, and visited a Best Western Inn but never stayed the night. That same night, pings showed that LUIS-FLORES travelled back to Sacramento.

34. On the morning of October 29, 2016, when LUIS-FLORES returned to Sacramento, pings showed that LUIS-FLORES did not go directly to his residence but instead stopped by several addresses of identified drug traffickers, to include the address of SACHAROW from whom Special Agent Nehring made multiple undercover heroin and methamphetamine purchases. LUIS-FLORES then stopped by the suspected **drug stash location** before eventually going to his residence. Based on the aforementioned facts regarding LUIS-FLORES' trip to San Juan Capistrano, I believe that this trip was drug related. I believe LUIS-FLORES met someone in San Juan Capistrano to pick up narcotics and upon arrival to Sacramento, LUIS-FLORES stopped by the residences of his drug distributors to drop off the narcotics. I therefore suspected that LUIS-FLORES **used the two garages located at 1601 Juliesse Ave.** as a drug stash location. During the next several weeks I observed LUIS-FLORES' phone frequently ping to the **drug stash location** and then travel to various parking lots where I suspected that LUIS-FLORES met with his drug customers to conduct drug deals. Pings showed that LUIS-FLORES would then return briefly to **the drug stash location** before going home.

35. On the morning of November 19, 2016, pings showed that LUIS-FLORES travelled by a vehicle to Paramount, California. Upon arrival LUIS-FLORES's phone pinged to a small parking lot for approximately ninety minutes. Then LUIS-FLORES went to a mall in Commerce, California, where he spent approximately an hour. From there LUIS-FLORES went to Embassy Suites in Downey, California, where the court-authorized, 30-day ping for 530-312-7575 expired. Based on LUIS-FLORES' previous similar short trips to the Los Angeles area, I believe that this trip was drug related and that LUIS-FLORES travelled down to the Los Angeles area to pick up narcotics from his SOS. I subsequently obtained the guest ledger and the surveillance video from Embassy Suites and learned that LUIS-FLORES rented two rooms next to each other for one night and the video showed that LUIS-FLORES personally checked in and checked out from the hotel the next day, on November 20, 2016. I believe that LUIS-FLORES rented the second room for his SOS who met with LUIS-FLORES at the Embassy Suites and supplied him with the narcotics. Based on my training and experience, drug dealers frequently meet in hotel rooms to conduct drug transactions and count the money in privacy.

36. On November 21, 2016, I drove by the suspected **drug stash location** in Sacramento and observed LUIS-FLORES meeting with multiple individuals, to include individuals who had narcotics related convictions, near the **Unit F garage**. The traffic at the **drug stash location** was busier than normal with lots of vehicles coming and leaving, which led me to believe that LUIS-FLORES was distributing the narcotics, which he had just delivered from the Los Angeles area, to his sub-distributors.

37. On December 7, 2016, a concealed remote controlled camera was installed with the view of the suspected **drug stash location (two northernmost garages at 1601 Juliesse Ave.).** I monitored the camera and consistently observed LUIS-FLORES, **TORRES**, and their criminal associates frequent both of the garages (**Unit F and the garage just north of it**). The traffic of subjects arriving and then departing shortly later was similar to the traffic typically observed at drug stash locations where subjects make quick stops to obtain narcotics and then depart. I observed subjects arrive empty handed and depart with a package. When I made inquiries into the criminal histories of some of the subjects observed at this location, majority of the subjects had prior drug convictions or were illegal aliens.

38. I observed LUIS-FLORES regularly stop by the suspected **drug stash location** and depart shortly. Pings showed that he then stopped by addresses of identified drug traffickers. A short time later, pings and the camera would show that LUIS-FLORES returned to the **drug stash location.** This type of traffic is consistent with narcotics being obtained from the **drug stash location** and delivered to sub-distributors.

39. It should be noted that the **drug stash location** was also used by LUIS-FLORES' associates to perform repairs of salvaged vehicles at both of the garages. However, many of the vehicles that were not wrecked (to include LUIS-FLORES') arrived to the **drug stash location**, entered inside the garages, and departed shortly. I believe that while these vehicles entered the garages briefly, narcotics were being placed or removed from concealed compartments in the vehicles. I also observed some of the same vehicles arrive, the subjects would open the

hood, walk inside the garages, then return minutes later, close the hood without any work being done to the engine, and depart this location. I believe that these subjects were doing so to make it appear as if they arrived to have their vehicles serviced at this location but instead they would pick up the narcotics and depart without any service actually being performed.

## December 2016 Undercover Deal with SACHAROW

40. On November 22, 2016, I obtained a federal ping order (2:16-SW-0737 DB), authorized by Honorable U.S. Magistrate Judge Deborah Barnes, extending the ping for LUIS-FLORES' 530-312-7575 cellphone number for another thirty days. Upon activation 530-312-7575 pinged to the suspected **drug stash location (1601 Juliesse Ave.),** and through surveillance I verified that LUIS-FLORES was still using this number.

41. On December 12, 2016, Special Agent Nehring contacted SACHAROW and arranged a drug deal the following day where SACHAROW would sell 3-4 ounces of heroin to Special Agent Nehring. SACHAROW stated that he just talked to his guy (e.g., his SOS) and that the guy was on his way to deliver the heroin to SACHAROW. At this time I checked the pings for LUIS-FLORES' phone and observed that LUIS-FLORES was moving in the direction of SACHAROW's residence. Tolls confirmed that SACHAROW talked to LUIS-FLORES immediately before he called Special Agent Nehring. I established surveillance at SACHAROW's residence and observed LUIS-FLORES arrive to SACHAROW's residence only to leave minutes later. I believe that LUIS-FLORES was the "guy" (e.g. the SOS) whose arrival SACHAROW was expecting and that at this time LUIS-FLORES delivered the heroin to SACHAROW.

42. The next day, on December 13, 2016, Special Agent Nehring contacted SACHAROW and stated that he was arriving to the agreed upon meet location to purchase the three ounces of heroin. SACHAROW told Special Agent Nehring that he already had four ounces of heroin. After SACHAROW sold 113 gross grams of heroin to Special Agent Nehring, SACHAROW drove to his residence and tolls showed that he immediately contacted LUIS-FLORES at 530-312-7575. I believe that SACHAROW was letting LUIS-FLORES know that the money generated from the heroin deal with Special Agent Nehring was ready and that LUIS-FLORES could stop by to collect the money.

43. Surveillance was maintained of SACHAROW's residence and approximately three hours later agents observed a white male adult (WMA), who had a drug use conviction and three convictions for Possession of a Methamphetamine, and an unidentified white passenger onboard arrive to SACHAROW's residence on a Ford Mustang. Approximately fifteen minutes later the Mustang departed followed by SACHAROW in his own truck. Surveillance observed SACHAROW stop by O'REILLY AUTO PARTS. Then SACHAROW very briefly stopped by two addresses in North Highlands, California. Based on the vehicles license plate registrations observed at these locations and who tolls showed that SACHAROW was in telephone contact with at that moment, I tentatively identified these individuals and noted that one of them had multiple arrests for Possession of Methamphetamine. Therefore, I believe that during these quick stops, SACHAROW was delivering narcotics to his drug customers. Then surveillance followed SACHAROW to an address where the Ford Mustang

and the WMA driver observed at SACHAROW's residence earlier met SACHAROW and together they began working on SACHAROW's truck's engine. At this point surveillance of SACHAROW was terminated.

44. I continued to monitor the pings for LUIS-FLORES' phone in anticipation that LUIS-FLORES would arrive to SACHAROW's residence to collect the money. Later that evening, pings showed that LUIS-FLORES was headed towards SACHAROW's residence and eventually the pings placed LUIS-FLORES directly at SACHAROW's residence. Tolls showed that minutes before LUIS-FLORES' arrival, he was in telephone contact with SACHAROW. I drove to SACHAROW's residence and observed a BMW sedan, which was familiar to me based on previous surveillance, departing the mobile home park where SACHAROW resides and LUIS-FLORES was the driver of the BMW. Based on the above described facts and the fact that LUIS-FLORES spent only approximately five minutes at SACHAROW's residence, I believe that the purpose of this trip was for LUIS-FLORES to collect the money generated from the drug deals conducted by SACHAROW. I subsequently followed LUIS-FLORES to the suspected **drug stash location**, where LUIS-FLORES entered the **northernmost garage** and spent approximately fifteen minutes there before going home.

## February 2017 Undercover Deal with SACHAROW

45. On February 2, 2017, I obtained a federal ping order (2:17-SW-0089 KJN), authorized by Honorable U.S. Magistrate Judge Kendall J. Newman, for LUIS-FLORES' 657-340-0399 cellphone number. Pings showed that 657-340-0399 spent the night hours at LUIS-FLORES' residence and through surveillance I confirmed that LUIS-FLORES was carrying the 657-340-0399 cellphone. On February 5, 2017, Special Agent Nehring contacted SACHAROW and placed an order for four ounces of heroin and SACHAROW stated that he would be able to conduct the transaction in the next few days. Tolls showed that SACHAROW subsequently contacted LUIS-FLORES at the 657-340-0399 number.

46. On the night of February 6, 2017, pings showed that LUIS-FLORES travelled by a vehicle to Commerce, California. On the early morning of February 7, 2017, pings placed LUIS-FLORES in a hotel where he spent approximately five hours. I subsequently submitted an administrative subpoena to that hotel and records showed that on the morning of February 7, 2017, LUIS-FLORES checked into a room using his alias name of "Roberto LUIS," his old address of 440 Wilson Ave., Sacramento, California, and his wife's phone number with only one digit off. Pings showed that LUIS-FLORES departed back to Sacramento early that afternoon and tolls showed that he was in contact with SACHAROW immediately after leaving Commerce, California. Special Agent Nehring contacted SACHAROW around that time and SACHAROW stated that he wouldn't be able to conduct the heroin transaction until his SOS would be back in town after 7 p.m.

47. That same evening, at approximately 7 p.m., I observed LUIS-FLORES returned to Sacramento arriving directly to the suspected **drug stash location**. Approximately two hours later, I observed LUIS-FLORES leave the **drug stash location** and arrive to SACHAROW's residence where he spent approximately half an hour. While LUIS-FLORES was at SACHAROW's residence, Special Agent Nehring contacted SACHAROW and

11

SACHAROW told Special Agent Nehring that he had received the heroin and was ready to conduct the drug transaction whenever Special Agent Nehring was ready.

48. On February 9, 2017, Special Agent Nehring met with SACHAROW and purchased 145.6 gross grams of heroin. After the drug deal, SACHAROW travelled directly to his residence and tolls showed that he contacted LUIS-FLORES at 657-340-0399. I believe that SACHAROW was letting LUIS-FLORES know that the heroin deal was completed and the drug proceeds were ready to be collected. For the next three hours surveillance did not see any arrivals to SACHAROW's residence and surveillance of SACHAROW was therefore terminated.

49. However, the pings, tolls, and the camera with the view of LUIS-FLORES' **drug stash location** were monitored. Pings and the camera showed that LUIS-FLORES was at the **drug stash location.** Then approximately thirty minutes after surveillance of SACHAROW was terminated, I observed LUIS-FLORES' Toyota sedan depart the **drug stash location** and the pings showed that LUIS-FLORES left the **drug stash location** and traveled to SACHAROW's residence (**4134 Vicksburg Lane, North Highlands, California**). Tolls also showed that LUIS-FLORES placed an outgoing call to SACHAROW around the time when LUIS-FLORES departed the drug stash location. I immediately drove to SACHAROW's residence and observed LUIS-FLORES exit SACHAROW's residence, enter his Toyota sedan and drive away. An unidentified HMA was also present in the passenger side of the Toyota. The camera showed that the Toyota arrived back to the drug stash location. I believe that during this quick visit to SACHAROW's residence, LUIS-FLORES had collected the money generated from SACHAROW's heroin deal and transported the money back to the drug stash location.

**March 2017 Undercover Deal with SACHAROW**

50. On March 7, 2017, I obtained a federal ping order (2:17-SW-0193 CKD), authorized by Honorable U.S. Magistrate Judge Carolyn K. Delaney, for LUIS-FLORES' 650-445-8166 cellphone number. I conducted surveillance of the 650-445-8166 pings and confirmed that LUIS-FLORES was carrying and using 650-445-8166.

51. On the evening of March 13, 2017, Special Agent Nehring called SACHAROW and arranged to purchase a pound of crystal methamphetamine. SACHAROW stated that he will make the arrangements and have the methamphetamine ready.

52. On the morning of March 14, 2017, tolls showed that SACHAROW contacted LUIS-FLORES at 650-445-8166 and approximately forty minutes later pings showed that LUIS-FLORES left his residence and arrived to SACHAROW's residence. I believe that at this time SACHAROW discussed with LUIS-FLORES regarding the availability of a pound of methamphetamine. Then pings showed that LUIS-FLORES travelled to the **drug stash location.**

53. On March 15, 2017, Special Agent Nehring met with SACHAROW and purchased approximately one pound of methamphetamine. Before SACHAROW left his residence to

conduct the drug deal with Special Agent Nehring, agents observed two vehicles arrive and depart SACHAROW's residence. Both of the subjects who arrived were tentatively identified and both had extensive criminal histories, including drug use, and Possession of Controlled Substance arrests. During this drug transaction SACHAROW told SA Nehring that he was unable to obtain the methamphetamine from his "Paisa" (e.g. his Hispanic SOS) because the "Paisa" was out of methamphetamine until approximately the next Monday (March 20, 2017) but the "Paisa" SOS still had a lot of heroin left. Therefore, SACHAROW stated that he had to obtain the methamphetamine from his alternate SOS.

### March 2017 Meetings Between LUIS-FLORES and SACHAROW

54. On the evening of March 19, 2017, pings showed that LUIS-FLORES arrived briefly to the drug stash location. At this time, I observed a lifted pickup truck arrive and the driver, tentatively matching the description of LUIS-FLORES, exited and walked towards the **second northernmost garage (Unit F)**. Minutes later, LUIS-FLORES walked from the garage, entered the pickup truck and departed. Several minutes later, pings placed LUIS-FLORES next to SACHAROW's residence (**4134 Vicksburg Lane, North Highlands, California**). The phone pinged near SACHAROW's residence for approximately fifteen minutes before returning back to the drug stash location. I observed the same lifted pickup truck arrive to the **drug stash location** and the driver walked towards the **Unit F garage.** LUIS-FLORES spent approximately fifteen minutes at the **drug stash location** and then left to his residence (**1570 Baines Ave.**). Based on LUIS-FLORES' brief stop at the drug stash location, before and after visiting SACHAROW's residence, and the fact that SACHAROW told Special Agent Nehring that his "Paisa" SOS will have the methamphetamine available around March 20, 2017, I believed that during this visit to SACHAROW's residence, LUIS-FLORES supplied SACHAROW with the methamphetamine.

55. On March 25, 2017, pings showed that LUIS-FLORES left his residence and travelled to SACHAROW's residence where he spent only several minutes because approximately fifteen minutes later pings showed that LUIS-FLORES arrived to the drug stash location. At this time, I observed a white in color Ford Transit van (same van **TORRES** used to deliver the heroin to SACHAROW in July of 2016) arrive to the **drug stash location** followed by a green in color GMC Sierra truck with a towing winch in the front, which was the GMC truck regularly driven by SACHAROW. LUIS-FLORES and SACHAROW exited their respective vehicles and walked towards **the two northernmost garages**. Then SACHAROW backed his truck into the **second northernmost garage (Unit F)**. After approximately twenty minutes from the time of arrival, the GMC truck departed with an ATV in the truck bed.

56. On March 27, 2017, pings showed that LUIS-FLORES again visited SACHAROW's residence briefly and then the pings placed LUIS-FLORES at the drug stash location.

### April 2017 Undercover Deal with SACHAROW

57. On April 19, 2017, I obtained a federal ping order (2:17-SW-0282 AC), authorized by Honorable U.S. Magistrate Judge Allison Claire, for LUIS-FLORES' 415-987-6985 and

SACHAROW's 916-869-5828 phone numbers. I conducted surveillance of the 415-987-6985 pings and confirmed that LUIS-FLORES was carrying 415-987-6985.

58. On the evening of April 26, 2017, Special Agent Nehring contacted SACHAROW and agreed to meet with SACHAROW on April 27, 2017 to purchase two ounces of heroin and a half pound of methamphetamine. SACHAROW stated that he was getting a pound of methamphetamine that evening from his "Paisa" SOS and that he would hang-up the phone after this conversation with Special Agent Nehring and immediately call the SOS to order the heroin as well. Tolls showed that immediately after hanging up, SACHAROW contacted LUIS-FLORES at 415-987-6985 and then called him again at 7:02 p.m. I monitored the pings for LUIS-FLORES' 415-987-6985 number and observed that at 7:58 p.m., LUIS-FLORES left his residence **(1570 Baines Ave.)** and travelled to the suspected **drug stash location** where I observed LUIS-FLORES arrive on a white Ford Transit van and enter the **northernmost garage**. After approximately ten minutes LUIS-FLORES returned from the **northernmost garage**, opened the rear door of the Ford van, and appeared to have placed something inside. Then LUIS-FLORES entered the driver's door and departed. Pings showed that from the **drug stash location** LUIS-FLORES drove to **his residence**. I monitored the pings of both SACHAROW's and LUIS-FLORES' phones and did not observe them meet that evening.

59. On the early morning of April 27, 2017, tolls showed that SACHAROW contacted LUIS-FLORES at 415-987-6985 and at 9:35 a.m., 415-987-6985 pinged directly in front of **SACHAROW's residence**. LUIS-FLORES spent only several minutes at SACHAROW's residence because the next ping showed that LUIS-FLORES had already left that location and approximately thirty minutes later arrived to the **drug stash location** on the Ford Transit van. I believe that on the evening of April 26, 2017 after talking to SACHAROW, LUIS-FLORES travelled to the **drug stash location** to pick up the heroin and methamphetamine. I believe LUIS-FLORES then stored the narcotics overnight at his residence **(1570 Baines Ave.)** or in the Ford van parked at his residence, because on the morning of April 27, 2017, LUIS-FLORES travelled directly to **SACHAROW's residence.**

60. At approximately 11:39 a.m., SACHAROW contacted Special Agent Nehring and stated that he was ready to conduct the drug deal. Surveillance was established at **SACHAROW's residence** and witnessed a vehicle arrive with two WMAs onboard and leave several minutes later. The driver was identified and after making inquiries with NCIC I learned that he was previously arrested for Possession of a Controlled Substance and Paraphernalia. Therefore, I believe that his was one of SACHAROW's drug customers who stopped by to purchase narcotics from SACHAROW.

61. Once Special Agent Nehring arrived to the agreed meet-location, surveillance witnessed SACHAROW leave his residence and meet with Special Agent Nehring where SACHAROW sold 79.5 gross grams of heroin and 256.5 gross grams of methamphetamine. SACHAROW told Special Agent Nehring that his "Paisa" SOS wanted to deal in "weight" and that the prices would go down if larger amounts were purchased. It should be noted that during all of the previous surveillances, agents never observed any other Hispanic nationals besides LUIS-FLORES, his HMA unidentified passengers, and his drug runner **TORRES**

arrive to SACHAROW's residence. All other arrivals were white subjects. SACHAROW stated that his "Paisa" SOS could provide a kilogram of heroin for $48,000, which was of very good quality and could be adulterated into twice as much (e.g, one kilogram could be mixed into two sellable kilograms). During this drug deal, Special Agent Nehring discussed with SACHAROW the next drug deal of approximately half a pound of heroin and several pounds of methamphetamine. SACHAROW stated that he would talk to his SOS, find out the prices, and arrange the next drug deal.

62. After the drug deal, surveillance followed SACHAROW back to **his residence.** Continuous surveillance was maintained of SACHAROW and agents witnessed SACHAROW leave his residence and make brief stops at several addresses. I believe that SACHAROW was delivering narcotics to his drug customers during these brief stops.

63. Then at 3:14 p.m., tolls showed that LUIS-FLORES contacted SACHAROW. Surveillance observed SACHAROW return to his residence at approximately 4:16 p.m. and at 4:20 p.m. and tolls showed that SACHAROW contacted LUIS-FLORES. I believe that at this time, SACHAROW finished his drug deals with other customers and was letting LUIS-FLORES know that the money generated from the drug deals was ready to be collected.

64. At approximately 5:22 p.m., pings showed that LUIS-FLORES left his residence and travelled directly to **SACHAROW's residence.** I observed LUIS-FLORES arrive on the Ford Transit van and park next to **SACHAROW's residence.** Several minutes later LUIS-FLORES' 415-987-6985 phone pinged in front of **SACHAROW's residence.** I then drove by and observed LUIS-FLORES next to the entrance of **SACHAROW's residence.** Approximately ten minutes later, I observed LUIS-FLORES depart **SACHAROW's residence** on the Ford van. I believe that during this brief visit LUIS-FLORES collected the drug proceeds from SACHAROW.

## Utilities of the Drug Stash Location

65. On April 24, 2017, I requested a SMUD Law Enforcement Customer Information Request regarding the utilities account of the garage at **1601 Juliesse Ave, Unit F, Sacramento, California.** SMUD responded that utilities at the above address were listed under the customer name of "Lucero Tepox REYES" and that the service started from 2/5/2017 and was currently active. I learned that REYES was a 25 y.o. female who listed the address of 740 Regatta Dr, Sacramento, California on her California driver's license. I recognized this address as being visited by LUIS-FLORES on several occasions based on the ping location data of his multiple prior identified cellphones. I drove by this address and observed some of the same vehicles I regularly observed frequenting the drug stash location. However, Hispanic males were the drivers of these vehicles. Therefore, I believe that LUIS-FLORES and his associates listed the utilities of the **Unit F garage** in REYES' name to avoid detection by law enforcement.

66. The second garage at **1601 Juliesse Ave, Sacramento, California**, which I suspected was being used by LUIS-FLORES and his associates as a drug stash location, and which was adjacent to **Unit F** and located just north of Unit F, did not have any identifying Unit

15

numbers or letters besides the logo of "**Applied Liberty Solutions, 844-4-APPLIED**" on the pedestrian door. I noted that all the seven garages at this location (**1601 Juliesse Ave, Sacramento, California**) were labeled in an ascending alphabetical order from the letter A to the letter F. Therefore, I conclude that the last (seventh) and **northernmost garage** had to be **Unit G**. On April 24, 2017, I requested a SMUD Law Enforcement Customer Information Request regarding the utilities at the **Unit G** garage and SMUD responded that utilities at Unit G were listed under the customer name of "Giovanni PEREZ" and that the service started from 8/29/2016 and was currently active. I noted that the service start date was approximately when I first identified this location as LUIS-FLORES' new drug stash location. I located a California DMV Identification card for PEREZ which listed an address of 2701 Corabel Lane, Apt 28, Sacramento, California. During surveillance of LUIS-FLORES in June of 2016, surveillance observed LUIS-FLORES arrive to Corabel Lane Apartments which is a gate community and LUIS-FLORES' passenger walked towards one of the apartments. I therefore believe that PEREZ is an associate of LUIS-FLORES and allowed LUIS-FLORES to store narcotics at the **Unit G** garage located at **1601 Juliesse Ave, Sacramento, California.**

## Training and Experience Regarding Drug Trafficking and Drug Traffickers

67. As a result of my experience and training, I have learned that traffickers who deal in various quantities of controlled substances, or those that assist in that venture, maintain and tend to retain accounts or records of those transactions. Such records detail amounts outstanding, owed, or expended, along with records tending to indicate the identity of co-conspirators. These records may be kept on paper or contained in memory calculators or computers. It is also my experience that these traffickers tend to keep these accounts and records in their residence and in the areas under their control. It is my training and experience, that in the case of drug dealers, evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986). It is also my training and experience that where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991).

68. Based upon my experience and training, I have learned that drug traffickers often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS); that those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection; that traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Typically, drug traffickers keep records of those registrations and transactions in their residence.

69. I have learned that large-scale drug traffickers often have on hand large amounts of United States currency in order to maintain and finance their ongoing business. It has been my experience that drug traffickers often keep large sums of currency, caches of drugs, financial instruments, precious metals, jewelry, automobiles and other items of value and/or proceeds of drug transactions, including evidence of financial transactions related to obtaining,

transferring, secreting or spending large sums of money acquired from engaging in the acquisition and distribution of controlled substances in their residence or in the areas under their control.

70. In my experience, traffickers commonly have in their possession, that is, on their person, at their residence and in the areas under their control, firearms, including but not limited to handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Such firearms are used by drug violators to protect their illicit drug trafficking operations, and themselves against law enforcement and other drug violators because the illicit drug trade is an inherently dangerous illegal activity involving large amounts of valuable contraband and drug proceeds. Such property may include, but is not limited to, narcotics and other dangerous drugs, jewelry, narcotic paraphernalia, books, records, ledgers and quantities of currency.

71. In my experience, traffickers commonly have in their possession, that is on their person, at their residences, and their vehicles, and in the areas under their control and which they have free and ready access to, drugs, including but not limited to in this case, heroin and methamphetamine, which they intend to distribute. It is my experience that drug traffickers commonly utilize these areas (vehicles, residences, properties, etc.) as locations to conceal their narcotics from law enforcement.

72. In my experience, drug traffickers may take or cause to be taken, photographs or videotapes of themselves, their associates, their property, and their product. Such traffickers often maintain photographs and/or videotapes at their residence or in the areas under their control.

73. In my experience, large scale traffickers often maintain in their possession and at their residence fictitious identification, including but not limited to, driver's licenses, employment cards, insurance cards, social security cards, certificates of birth and passports which are obtained by the traffickers and utilized in an effort to prevent law enforcement identification of the traffickers and their drug trafficking activities.

74. In my experience, drug traffickers often utilize vehicles in which to transport and distribute controlled substances in facilitation of their trafficking activities. It has also been my experience that traffickers will also utilize vehicles as locations in which to store controlled substances prior to distribution. During prior investigations, I have observed that drug traffickers will often utilize vehicles registered in the names of individuals other than themselves in an effort to avoid detection by law enforcement.

75. In addition, these traffickers tend to attempt to legitimize their assets by establishing domestic and foreign businesses, by creating shell corporations, by utilizing bank haven countries and attorneys specializing in drafting and establishing such entities employed to "launder" the proceeds derived from the distribution of controlled substances.

76. In establishing these entities, the traffickers often must travel to meetings in foreign countries as well as domestically. As a result of that travel, records are generated reflecting travel by

commercial and private aircraft, Commercial Ocean and private vessels as well as common carrier(s).

77. Individuals involved in the distribution of heroin and methamphetamine often make, or cause to be made, pictures, videos, movies, compact discs, floppy discs, or other such items which are or contain photographic or digital images in order to memorialize their narcotics distribution, use, possession, or any other activities surrounding their heroin and methamphetamine trafficking activities, and that such items often identify co-conspirators in their heroin and methamphetamine trafficking activities.

78. It has been my experience in the past, and particularly in this case, that when suspects utilize mobile telephones to communicate with cooperating individuals or undercover agents to set up the heroin and methamphetamine deals, records relating to these activities will be found stored in the cellular telephone.

79. I know that narcotics traffickers use mobile telephones to communicate with one another, either by voice or text message. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information; the information stored in a telephone used by a narcotics trafficker is evidence of the associations of the narcotics trafficker, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's mobile telephone can contain evidence of narcotics trafficking because it shows the communications or planned communications of a narcotics trafficker and the telephone numbers of those with whom the narcotics trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Narcotics traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics trafficker who took pictures of evidence of crime. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

80. As described above and in **Attachment A**, this Affidavit seeks permission to search and seize things that are related to the heroin and methamphetamine conspiracy between LUIS-FLORES and his co-conspirators, in whatever form such things are stored. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Even when a user deletes information from a device, it can sometimes be recovered with forensics tools. Similarly, things that have been viewed via the Internet

are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

81. It is my opinion, based on my training and experience, and the training and experience of other law enforcement investigators to whom I have spoken, that the items listed in **Attachment B** are items most often associated with the distribution of controlled substances, including heroin and methamphetamine as well as the proceeds from such illegal operations.

82. The facts set forth in this Affidavit are known to me as a result of my personal participation in this investigation, through conversations with other agents who have participated in this investigation, and from reviewing official reports, documents, and other evidence obtained as a result of this investigation.  This Affidavit is not an exhaustive enumeration of the facts that I have learned during the course of this investigation but, instead, are facts that I believe support a finding of probable cause to search the requested locations.

83. Based on my experience and training, and after consulting with other law enforcement officers experienced in drug investigations, I know that individuals involved in drug dealing often maintain at their residences, vehicles, and their persons the items described in **Attachment B**.  Individuals involved in drug dealing also often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Therefore, I am requesting authority to seize all the items listed in **Attachment B** to this Affidavit and incorporated here by reference.

## Conclusion

84. In this case, the facts set forth in this Affidavit demonstrate probable cause to believe that the locations listed in **Attachment A** to this Affidavit contain evidence of a crime, contraband, fruits of a crime, and other items illegally possessed, property designed for use, intended for use, or used in committing a crime, specifically, by **Ibis Alberto LUIS-LUIS-FLORES, Steven Christopher SACHAROW, and Richard Garnica TORRES** and their ongoing efforts to distribute and possess with intent to distribute heroin and methamphetamine in violation of the following statutes:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine.

- Title 21 U.S.C. Section 841(a)(1) –Distribution and Possession with Intent to Distribute Heroin and Methamphetamine.
  Facilitate Drug Trafficking.

85. Specifically, I respectfully request authority to search:

A. The residence located at **1570 Baines Ave, Sacramento, California (Luis-Flores residence).**
B. The garage located at **1601 Juliesse Ave Unit F, Sacramento, California.**

19

    **C.** The northern most garage located at **1601 Juliesse Ave, Sacramento, California**, with the following logo on the pedestrian door: **"Applied Liberty Solutions, 844-4-APPLIED."**

    **D.** The residence located at **4134 Vicksburg Lane, North Highlands, California (Sacharow residence).**

    **E.** The person of **Richard Garnica TORRES**.

86. It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. . Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

    I swear under penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information and belief.

 

Maxim Lashchuk
Special Agent
Drug Enforcement Administration

 

Sworn to me on _May 30, 2017_

Hon. KENDALL J. NEWMAN
United States Magistrate Judge

 

Approved as to form:

Paul Hemesath
Assistant United States Attorney

**Attachment A-1**
**Location to be Searched**

**A.**  The residence located at **1570 Baines Ave., Sacramento, California**.  The residence is a single family, two-story building, with an attached garage, located on the south side of Baines Ave. and the corner of North Bend Drive. The building is beige in color with a white in color attached garage door and brick garage front walls. A white in color plate with black in color numbers "1570" is affixed horizontally on the west side of the garage. A paved walkway from the driveway leads to the front door, which faces Baines Ave.

Including the residence, all storage areas, all trash receptacles, and all vehicles over which the owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle; DMV records show ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.



**Attachment A-2**
**Location to be Searched**

The garage located at **1601 Juliesse Ave., Unit F, Sacramento, California.** Unit F is located in a warehouse style commercial building with seven separate garages labeled alphabetically in an ascending order beginning on the south end with the letter A. The warehouse is beige in color with brown in color trim and brown in color roll-up garage and pedestrian doors. The black in color numbers "1601" are affixed horizontally on the south side of the building facing Juliesse Ave. **Unit F** is the second northern most garage (sixth from the south end) and has the letter "F" affixed on the pedestrian door.

Including the garages, all storage areas, all trash receptacles, and all vehicles over which the owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle; DMV records show ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.







## Attachment A-3
## Location to be Searched

The northernmost garage located at **1601 Juliesse Ave., Sacramento, California,** which is a warehouse style commercial building with seven separate garages labeled alphabetically in an ascending order beginning on the south end with the letter A. The northernmost garage does not contain any visible marking (e.g., Unit X, etc.), however, the pedestrian door contains the following writing: "Applied Liberty Solutions 844-4-APPLIED." This Garage is adjacent and just north of Unit F described above. The warehouse is beige in color with brown in color trim and brown in color roll-up garage doors and pedestrian doors. The black in color numbers "1601" are affixed horizontally on the south side of the building facing Juliesse Ave.

Including the garages, all storage areas, all trash receptacles, and all vehicles over which the owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle; DMV records show ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.



### Attachment A-4
### Location to be Searched

The residence located at **4134 Vicksburg Lane, North Highlands, California**. The residence is a single family, single-story mobile home, located in the "Fairway Estates" mobile home park. The residence is located on the south side of Vicksburg Lane. The building is light gray in color with bluish gray trim and porch. The residence has overhanging roofs on both the east and west sides, with a porch on the east side and a driveway with a detached shed on the west side. The black in color numbers "4134" with a white in color background are affixed horizontally on the east side of the residence near the porch. A front door is located in the center of the east (porch) side of the residence and a glass sliding door is located on the west (driveway) side.

Including the residence, shed, all storage areas, all trash receptacles, and all vehicles over which the owner, occupant, or resident of the aforementioned premises has dominion and control, as determined by the agents at the time of the execution of the search warrant by agent's observation of such persons operating or accessing the vehicle; DMV records show ownership or use of the vehicle; witness statements establishing ownership or use of the vehicle; or car keys to operate the vehicle found in the actual or constructive possession of such person found at the residence.







**Attachment B**
**Items to be Seized**

Agents are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Ibis Alberto LUIS-LUIS-FLORES, Steven Christopher SACHAROW, Richard Garnica TORRES, and their co-conspirators:

- Title 21 U.S.C. Sections 846 and 841(a)(1) – Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine.

- Title 21 U.S.C. Section 841(a)(1) – Distribution and Possession with Intent to Distribute Heroin and Methamphetamine.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including heroin and methamphetamine, or items frequently used to distribute heroin and methamphetamine or items containing residue from the distribution of heroin and methamphetamine; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin and methamphetamine during this investigation;

3. Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.     Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.     Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.     Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.     Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.    Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person, including LUIS-FLORES, SACHAROW, and TORRES;

11.    Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

12.    All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with LUIS-FLORES, SACHAROW, and TORRES during execution of the warrant. This authority to search such mobile telephones includes the following within each mobile telephone:

    A.     Incoming call history;
    B.     Outgoing call history;
    C.     Missed call history;
    D.     Outgoing text messages;
    E.     Incoming text messages;
    F.     Draft text messages;
    G.     Telephone book;
    H.     Data screen or file identifying the telephone number associated with the mobile telephone searched;

I.     Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;

J.     Voicemail;

K.     User-entered messages (such as to-do lists);

L.     Photographs; and

M.     Any passwords used to access the electronic data described above.